UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

--------------------------------------------------------x
                        :

KATHLEEN MITCHELL           :             3:10 CV 902 (CSH)
                        :

V.                          :
                        :

MICHAEL J. ASTRUE,        :
COMMISSIONER OF SOCIAL SECURITY  :             DATE: MAY 24, 2011
                        :
-------------------------------------------------------- x

## RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A REHEARING, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff disability insurance benefits ["DIB"].

## I. ADMINISTRATIVE PROCEEDINGS

On June 20, 2007, plaintiff, Kathleen Mitchell, applied for DIB benefits, claiming that she has been disabled since September 1, 1998 due to depression and anxiety, bipolar disorder, and panic and "rage" attacks.[1] (Certified Transcript of Administrative Proceedings, dated July 16, 2010 ["Tr."] 126-30; see Tr. 141). The Commissioner denied plaintiff's application initially, and after review by a Federal Reviewing Officer. (Tr. 71-83; see Tr. 84, 86-88). On July 26, 2008, plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"](Tr. 89-93), and on December 2, 2009, a hearing was held before ALJ Deirdre

---

[1]While plaintiff seeks an onset date of disability of September 1, 1998, she also reports that she did not stop working until June 20, 2000. (Tr. 141). However, plaintiff only acquired sufficient quarters of coverage for DIB to remain insured through September 30, 1998, so that plaintiff must establish that she was disabled for the period of September 1 to September 30, 1998. See 20 C.F.R. §§ 404.101, 404.130-404.131. (See also Tr. 131-32, 138-39, 149). On two occasions, plaintiff claimed that she has been "totally disabled . . . since the mid 1990's." (Tr. 84, 89).

R. Horton, at which plaintiff, her husband, Robert Mitchell, and a medical expert, Dr. Billings Fuess,[2] testified. (Tr. 19-70; see Tr. 97-111, 117-24). Plaintiff was represented by counsel. (Tr. 19, 21, 85, 125; see Tr. 94-96). On January 14, 2010, ALJ Horton issued her decision, in which she concluded that plaintiff is not disabled. (Tr. 4-18). On April 19, 2010, the SSA issued its Notice of Decision Review Board Action, informing plaintiff that after a review of her file, the Decision Review Board affirmed the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On June 9, 2010, plaintiff filed her complaint in this pending action, and six days later, this case was referred from Senior United States District Judge Charles S. Haight, Jr. to this Magistrate Judge. (Dkts. ##1, 4). On July 30, 2010, defendant filed his answer. (Dkt. #7).[3] On November 11, 2010, plaintiff filed her Motion for Order to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand, and brief in support (Dkt. #11; see Dkts. ##8-9), and on February 18, 2011, defendant filed his Motion to Affirm the Decision of the Commissioner. (Dkt. #16; see Dkts. ##12-15).

For the reasons stated below, plaintiff's Motion for Order to Reverse the Decision of the Commissioner (Dkt. #11) is denied, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #16) is granted.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1943 and is sixty-eight years old. (Tr. 27, 128). Plaintiff has no children and she lives with her husband of thirty-four years in their home. (Tr. 26-27, 30, 40, 129, 169). Plaintiff completed two years of college and did not attend special education

---

[2]See note 16 infra.

[3]Attached to defendant's answer was a certified copy of the administrative transcript, dated July 16, 2010.

classes, although she underwent a "[l]earning [e]valuation" in 1990 when she was considering a "career change and going back to school for interior design." (Tr. 143, 147, 224-31).[4]

According to plaintiff, she only gets three to four hours of sleep per night and she suffers from restlessness, anxiety, insomnia, suicidal ideation, delusions, a fear G-d is punishing her, fear of being alone, bladder problems, gastritis, a pre-glaucoma condition, "twitching[,]" and "itching." (Tr. 170, 177, 189, 195, 199, 209-10).[5] She also reports drowsiness, loss of appetite, and dizziness as side effects from her various medications. (Tr. 187). As of July 8, 2007, plaintiff could get dressed, prepare "cereal [and] simple sandwiches[,]" and could complete some household chores such as emptying the dishwasher and clothes dryer. (Tr. 169-70, 172). However, in an undated appeal form, she reported

---

[4]Plaintiff's medical records begin when she was seen on May 14, 16, and 18, 1990, by Janet Brain, EdM for a learning evaluation. (Tr. 224-31). Plaintiff reported difficulty understanding mathematical concepts, assembling anything that required mechanical skills, and a poor sense of direction. (Tr. 224). After plaintiff underwent a variety of learning tests, Brain noted tracking difficulties when reading, and noted that plaintiff "could easily focus on the visual details of letters or numbers," but had more difficulty with geometric designs. (Tr. 226). Plaintiff exhibited weaknesses in her "short term visual sequential memory," and Brain noted that these difficulties would make it more difficult to read a map or to find "her way from place to place when driving." (Tr. 226-27). In some cases, plaintiff's ability to following directions was limited, and Brain noted that some courses might be more difficult for plaintiff, such as drafting, but that plaintiff's other strengths might "help her compensate for areas of weakness." (Tr. 227-28). Brain stated that plaintiff's difficulty with mathematics was "suggestive of a learning disability . . . i.e. dyscalculla." (Tr. 229-31). She also described plaintiff as a "very articulate and organized woman who has always used her strong verbal and social skills to pursue career paths that included a great deal of involvement with people." (Tr. 230).

[5]Plaintiff takes or has taken Ambien and Flurazapam as a sleep aid, Clonazepam for anxiety, Clozipine and Lamictal as an anti-psychotic, Seroquel, Lithium and Abilify for bipolar disorder, Cymbalta for depression, Topamax to address her weight and appetite, Zyprexa for paranoid beliefs, Xalatan for a pre-glaucoma condition, and Omepazole and Sucrolfate for gastritis. (Tr. 187, 198, 209-10, 270). Additionally, plaintiff has been prescribed Ativan, Trazadone, Seroquel, and ReQuip (Tr. 171), Risperdal, Klonopin, Hyoscyamine, Asacol, Paxil, Syntest, and Dilaudid (Tr. 234), Mysoline, Propanolol, and Miratapine (Tr. 258-59), Asacol and Remeron (Tr. 262), Ativan, Efflexor, Toprol and Zyprexa (Tr. 302), Serzone, Creatinine Serum, Lithobid and Neurontin (Tr. 377), and Welbutrin (See Tr. 317). Patient also received nine sessions of right unilateral electro-convulsive therapy ["ECT"]. (Tr. 279).

being unable to prepare food, care for herself, or care for her home.  (Tr. 188, 199).

According to plaintiff, she is "unable to pick out clothes . . .  unless they are la[i]d out" for

her, she cannot drive, she cannot shower or wash her hair, sometimes she has difficulty

eating and using the toilet, she needs reminders to do chores and to organize her

medication, and she cannot remember or is too sick to pay bills, handle a saving account,

or use a checkbook.  (Tr. 170, 173, 178, 184, 188, 199).  Plaintiff reported that she is afraid

of the shower, stove, refrigerator. (Tr. 170, 172).  She walks daily and reported taking taxis

to visit her doctor and rides with her husband on trips including going out with her husband

to purchase groceries. (Tr. 172, 173, 174).  Plaintiff watches television, usually the "same

channel all day[,]" (Tr. 169, 173, 184, 188),  she has ceased engaging in most social

activities (Tr. 34), and she has been estranged from her sisters for at least ten years.  (Tr.

40).

    According to the plaintiff, her illnesses affect her ability to walk, climb stairs,

remember things, complete tasks, understand, follow instructions, concentrate, work either

at a job or as a volunteer, drive a car, operate appliances such as the microwave and

television, make phone calls, make plans, or manage her affairs.  (Tr. 28, 170-71, 173-74,

176).  Plaintiff reported staggering or falling when walking or using stairs (Tr. 176),  and she

cannot follow instructions, she sometimes loses track of what she reads, and she cannot

handle stress due to anxiety.  (Tr. 175-76).  Plaintiff has a caretaker to help with her daily

living skills, as she requires twenty-four hour supervision.  (Tr. 28-29, 32; <u>see</u> Tr. 195, 199).

    Plaintiff's work history reflects a series of jobs as a sales director from 1980 until

1982, as a senior sales manager from 1983 until 1989, as a personal assistant from 1988

until 1989, as an administrative assistant for four months in late 1990, and a salesperson and

assistant decorator from 1993 until 1995.  (Tr. 153; <u>see also</u> Tr. 131-39).

Plaintiff described her work from January 1963 until December 1989 generally as being a "[b]usiness [e]xecutive."  (Tr. 142).  In the positions she held during that time period, plaintiff was responsible for budgeting, planning, sales and managing employees, including hiring and firing employees.  (<u>Id.</u>).  She walked, stood, or reached for three hours, sat for five hours, and handled, grabbed or grasped big or small objects for two hours.  (<u>Id.</u>).  According to the plaintiff, she had to carry folders and boxes up to twenty pounds, and most frequently lifted less than ten pounds.  (<u>Id.</u>).

From December 1980 until July 1982, plaintiff worked as a "Conference Sales Director."  (Tr. 153, 166).  In that position she managed a conference sales program, oversaw staff, and coordinated events.  (Tr. 167). She walked, stood, sat, wrote, typed or handled small objects for ten hours per day. (Tr. 166).

From June 1983 until August 1986, plaintiff worked as a "Senior Sales  Manager" (Tr. 153, 164), and from August 1986 to August 1987, plaintiff worked as a "Convention Sales Manager." (Tr. 153, 162-63). In the former position she made sales trips and trained and managed employees to do the same (Tr. 165), and in the latter position she marketed and arranged business conventions and prepared internal documents relating to the same. (Tr. 163).  Plaintiff worked as a "Personal Assistant" to a television celebrity from March 1988 to December 1989, in which job she managed a business office, coordinated a schedule, worked on a television show, and managed two residences and the staff of each, and acted as a curator of an art collection.  (Tr. 153, 158, 161).  In all of those positions, she walked, stood, sat, wrote, typed or handled small objects for eight to ten  hours  per day.  (Tr.  158, 160, 162, 164, 166).   She hired and fired employees and she was a "lead

worker." (Tr. 158, 160-62, 164-66).

From July 1990 until November 1990 plaintiff worked as an "Administrative Assistant." (Tr. 153, 156). She was responsible for managing an office, purchasing fabric and furnishings, scheduling, and maintaining files (Tr. 157), and she walked, stood, sat, wrote, typed or handled small objects for eight hours. (Tr. 156).

From October 1993 to June 1995, plaintiff worked three hours a day, three days a week, as a "Salesperson/Assistant Decorator," in which position she assisted customers in purchasing furniture and she answered their interior design questions. (Tr. 153-55). She walked, stood, sat, wrote, typed or handled small objects for three hours per day. (Tr. 154).

Plaintiff's husband testified that plaintiff attempted to go to design school in 1990 but eventually gave it up, because she felt that "she wasn't able to do it." (Tr. 39). Additionally, plaintiff was employed by a former work contact of her husband for a few months on a part-time basis in 2000; plaintiff worked as a sales manager but was demoted to a sales assistant before her job was terminated. (Tr. 43, 141).

A. DR. LEVINE'S RECORDS

Plaintiff was treated by Dr. Robert Levine, a psychopharmacologist, from May 1997 until December 2006. (Tr. 393; see Tr. 34, 370-378).[6] Dr. Levine's records are the only records in the medical file that span the relevant time period. On May 8, 1998, Dr. Levine noted that the plaintiff's "irritability and volatility are gone[,]" and plaintiff was "doing well"; plaintiff was taking Lithoboid and Serzone. (Tr. 377-78). On June 22, 1998, Dr. Levine noted that plaintiff was "not doing as well[,]" and "[h]ad an outburst." (Tr. 377). Dr. Levine changed her medication, and he tested plaintiff's Lithium levels that day and again

---

[6]Prior to the 1997 records, on September 7, 1996, plaintiff was prescribed Serzone by Dr. Arnold Benton. (Tr. 451).

on July 2, 1998.  (<u>Id.</u>).  On September 10, 1998, plaintiff's medication was changed again as she was "[u]nable to tolerate [N]eurontin."  (<u>Id.</u>).  Plaintiff was prescribed Risperdal.  (<u>Id.</u>).  Her Lithium levels were tested an additional thirteen times that calendar year.  (<u>Id.</u>).

In 1999, plaintiff's Lithium levels were checked approximately ten times, and plaintiff was treated with Klonopin, Risperdal, Paxil, and Lithoboid.  (Tr. 376-77).  On July 26, plaintiff had an office visit, but there are no associated notes.  (Tr. 376).  On October 12, 1999, plaintiff complained of "ataxia and intention tremor[,]" but her "[p]anic [was] gone[,]" and her "[t]emper outbursts [were] gone."  (<u>Id.</u>).  Nine days later, plaintiff reported feeling "very panicky" and her Klonopin prescription was increased back to its prior level.  (<u>Id.</u>).[7]

On January 10, 2000, Dr. Levine noted that plaintiff could be seen once or twice a year and that he would mail prescriptions to her. (<u>Id.</u>).  The twelve medication management records for 2000 reflect that plaintiff's prescriptions were sent to plaintiff's pharmacy.  (Tr. 375-76).  On December 7, 2000, Dr. Levine noted that plaintiff is "doing well in every way. [I] [w]ill have her continue the same regimen" of Risperdal, Paxil and Klonopin.  (Tr. 375).[8]

There were five entries for 2001, once again mostly dealing with medication management.  (<u>Id.</u>).  On May 15, 2001, Dr. Levine noted that plaintiff is "doing fine seen yearly."  (<u>Id.</u>)(emphasis omitted).  On December 10, 2001, Dr. Levine noted that plaintiff "is basically doing well but disturbed by loss of libido."  (<u>Id.</u>).  She was prescribed Periactin which was "helpful[.]"  (<u>Id.</u>).

In 2002, plaintiff received prescription refills by mail on two occasions, and on

---

[7]Additional case notes for 1999 record a missed appointment, "OV," and contact with a pharmacy. (Tr. 376).

[8]The remaining case notes for that year concerned arrangements made by Dr. Levine's office or the pharmacy to fill plaintiff's prescriptions.  (Tr. 375-76).

December 12, 2002, Dr. Levine noted plaintiff "is doing well in every way. . . and has had no panic attacks"; on that basis he said he would "continue the same regimen" of Risperdal, Klonopin and Paxil. (Id.). On January 27, 2003, plaintiff requested Valium for anxiety attacks related to arguments with her "boyfriend"; Dr. Levine sent the prescription by mail to plaintiff's house. (Id.). On April 24, 2003, plaintiff reported panic attacks and sexual problems. (Id.). Plaintiff's Paxil and Klonopin dosages were increased, and Dr. Levine planned to speak with plaintiff's husband. (Id.). On July 15, 2003, Dr. Levine prescribed Valium in addition to Paxil and Klonopin (id.), and on November 6, 2003, plaintiff reported a "return of symptoms and loss of sexual feelings." (Tr. 374). Plaintiff was prescribed Paxil, Klonopin, Lexapro, and Risperdal. (Id.).[9]

On January 5, 2004, plaintiff reported panic attacks along with irritable bowel symptoms. (Id.). Sixteen days later, plaintiff reported "almost constant panic attacks[,]" which were treated with a change in medication, and the addition of Valium, Neurontin and Buspar. (Id.). On May 14, 2004, plaintiff reported that she was in a "constant state of stress" due to financial problems, and her medication was changed as a result. (Id.). By June 22, plaintiff reported "feeling much better" on Klonopin 3-4 mg daily, although a week later she reported feeling "mildly ataxic[,]" and she was suffering from "severe diarrhea and urinary incontinence"; her medication was changed and she was referred to a gastroenterologist. (Id.). Two weeks later, on July 13, 2004, plaintiff was experiencing anxiety and panic relating to a scheduled colonoscopy (Tr. 373), and by November 22, 2004, plaintiff had "slipped into a depression"; her medication was changed due to incontinence.

---

[9]Plaintiff's husband testified that plaintiff was treated by a psychiatrist in Ridgefield for a few years beginning in approximately 2003 (Tr. 68); however, there are no records to support this testimony.

(Id.).

On January 5, 2005, plaintiff reported feeling "great" and "wonderful," but nineteen days later, plaintiff reported being "tormented by obsessional worry." (Id.). Her medication was changed, and three days later plaintiff reported restlessness, insomnia, and nausea. (Id.). On February 16, 2005, plaintiff was suffering from panic attacks, dry mouth, and a pounding chest, and the next day, she reported a reduction in anxiety after taking an increase dose of Neurontin, but the change in medication led to double vision. (Id.). On March 31, 2005, plaintiff was "feeling completely well" and her incontinence had ceased. (Tr. 372). On September 8, 2005, plaintiff reported panic attacks and "overwhelm[ing]" anxiety. (Id.). There are six additional entries in 2005, all relating to medication management. (Id.).

On January 3, 2006, plaintiff reported stomach pains, and twenty-three days later, plaintiff reported gagging and dry mouth. (Id.). Her medication was changed, because although Cymbalta was effective, it had caused dyspepsia. (Tr. 371-72). On March 9, 2006, plaintiff's "anxiety [was] soaring although she [was] not getting full panic attacks." (Tr. 371). Plaintiff was in an automobile accident as noted on April 19, 2006 (id.), and on June 29, 2006, plaintiff reported no anxiety attacks but "a state of fear and . . . fearful ruminations." (Id.). A week later, on July 6, 2006, plaintiff reported an "anxiety episode," and additional prescriptions were issued. (Id.). On October 11, 2006, a second automobile accident was noted; plaintiff was taking Dilaudid and Neurontin at that time (Tr. 370), and on November 20, 2006, plaintiff informed Dr. Levine that she could not make an office appointment because she was "incapacitated due to [her] medical condition." (Id.). On December 14, 2006, plaintiff was frantic and reported taking an increased dose of Klonopin;

Dr. Levine refused to prescribe additional Klonopin.  (Id.).  There were a total of thirty-five entries in 2006, and with the exception of the foregoing notes, the entries all related to medication management.  (Tr. 370-71).  In 2007, Dr. Levine had only three entries, two of which related to plaintiff's application for disability benefits and the third referenced that plaintiff's records were sent to Dr. Ameet Lamba.  (Tr. 370).

B. REMAINING MEDICAL RECORDS

On August 1, 2006, plaintiff was seen by Dr. Vashapriya Iyer for complaints of abdominal pain, abnormal eating, weight gain and depression.  (Tr. 313-15; see also Tr. 316-25, 397-98, 402-05, 416-17, 420-21, 423).  Three days later, plaintiff reported her stomach pains were "severe" (Tr. 316), and the next day, Dr. Iyer changed plaintiff's medication from Welbutrin to Paxil and she was treated with Protonix, which provided temporary relief.  (Tr. 317, 321).  On August 11, 2006, plaintiff underwent an esophagogastroduodenoscopy under the care of Dr. Anthony D'Souza for her "severe hunger and gnawing pains." (Tr. 394-96).  Dr. D'Souza noted a hiatal hernia and chronic gastritis and he took biopsies. (Id.; see Tr. 399).  After the surgery, plaintiff informed Dr. Iyer that her symptoms had returned and progressively intensified.  (Tr. 397-98; see also Tr. 402-05).  On August 31, 2006, plaintiff underwent a CT scan of her abdomen and pelvis, which identified abnormal healing of one of her left ribs, and possible gastritis.  (Tr. 400-01, 413, 415, 419).

On October 2, 2006, plaintiff underwent a hepatobiliary scan of her liver, bile ducts and gall bladder; the scan yielded normal results.  (Tr. 406).   Also on October 2, plaintiff underwent  CT scans of her abdomen and pelvis post, and her chest. (Tr. 407-11).[10]  Two

_____

[10]Plaintiff also had blood work done.  (Tr. 412-15).

days later, plaintiff was seen by Dr. Theerayus Chumavech for "epigastric subxiphoid abdominal pain." (Tr. 232). After reviewing plaintiff's chest CT, she was diagnosed with "post-traumatic ruptured diaphragm with herniation omentum" caused by a car accident plaintiff was in on June 30, 2006. (Tr. 232-33, 409).

On October 17, 2006, plaintiff was seen by Dr. Rahul Anand for a consultation; he recommended "rotating her [R]ipserdal" to rule out "any esoteric side effects" and for the plaintiff to receive an endocrine consultation. (Tr. 237-41). The next day, plaintiff was seen by Dr. Antonio Pantaleo for a "suspected endocrine disorder" after plaintiff complained of constant hunger and pain which caused her to eat every hour. (Tr. 234-35). Plaintiff's blood work and gastroscopy were normal. (Tr. 234). Dr. Pantaleo concluded that plaintiff's symptoms "do not seem to indicate a specific endocrine condition"; he diagnosed her with "[p]ossible hypoglycemia" and prescribed Dilaudid PO. (Tr. 234-35).[11]

On December 10, 2006, plaintiff began treatment with Dr. Ameet Lamba for psychopharmacology, individual psychotherapy and family therapy; Dr. Lamba initially diagnosed plaintiff with Generalized Anxiety disorder, rule out depression, and she later added Major Depressive disorder, and Bipolar Disorder with psychotic features. (Tr. 444; see Tr. 435-45).[12]

Eight days later, plaintiff was admitted to Norwalk Hospital for anxiety attacks; she was seen by Dr. Harold Ginsberg and Dr. Katherine Michael. (Tr. 245; see Tr. 245-57, 425). Plaintiff reported restlessness, lack of sleep, worry, and "feeling hungry all the time." (Tr.

---

[11]On November 9, 2006, plaintiff reported to Dr. Anand that she had "100% relief of her symptoms." (Tr. 242-44; but see Tr. 421 (plaintiff left a message the same day and again on November 20, 2006 stating she was nauseous and felt worse)).

[12]On December 10, 2006, plaintiff was seen in the emergency room of Norwalk Hospital for acute anxiety. (Tr. 422).

245). She stated that she was seen by Dr. Levine "for many years[,]" but she discontinued seeing him because she was "too anxious to manage the drive down to New York City." (Id.). Plaintiff exhibited "decreased spontaneous movement," she was hypophonic, and she had a flat affect. (Tr. 246). Plaintiff reported feelings of anxiety contrasted with her "calm, slowed and indifferent" presentation. (Id.). A history of "benzodiazepine use and possible abuse" was noted and plaintiff's Klonopin intake was reduced. (Id.). Plaintiff was diagnosed with Generalized Anxiety Disorder, benzodiazepine dependence, mood disorder, NOS, and gastrointestinal complaints. (Tr. 247; see also Tr. 250). During her hospitalization, plaintiff was treated with Seroquel for anxiety, although she continued to report feeling anxiety and she continued to present a "flat, blunted affect and calm demeanor." (Tr. 246). Upon discharge, on December 22, 2006, plaintiff was assigned a GAF score of 36. (Tr. 246, 248).

Plaintiff was admitted to Hall-Brooke Behavioral Health Services on January 12, 2007, where she was treated by Dr. Miheala Boran. (Tr. 258-59, 273-74). She had "depressed mood, increased anxiety, paranoid ideation, suicidal thoughts, continuous involuntary movement" and "tonic-clonic movements of the upper body and limbs." (Tr. 258, 273). Plaintiff was diagnosed with Major Depressive Disorder, recurrent, severe with psychotic features, and Post-Traumatic Stress Disorder, "rule out Conversion disorder." (Tr. 258, 273). While in that facility, her Clonazepam and Zyprexa were discontinued and she was treated with Mirtazapine, Xanax, Mysoline, Propanolol, and Seroquel. (Id.). Plaintiff's involuntary movements continued and she was transferred to St. Vincent's Medical Center on January 18, 2007 for continuation of her treatment and for a neurological work-up. (Id.). Her GAF score upon discharge was 40. (Id.).

At St. Vincent's, plaintiff was seen by Dr. Siegel, a neurologist, and Drs. Abdelmonim Affany and Boran. (Tr. 263-69). Dr. Siegel concluded that plaintiff did not exhibit any

neurological deficits, and he opined that plaintiff's tremors and her inability to walk "[were] manifestations of a conversion disorder." (Tr. 263, 265). Dr. Affany opined that an "alternate diagnosis would be that of a drug reaction." (Tr. 268). Plaintiff was diagnosed with Major Depressive Disorder, with psychotic features, and conversion disorder, and a dependent personality, and she was treated with Remeron, Seroquel, and Klonopin. (Tr. 263). Plaintiff "partially improved"; she was "less depressed [and] able to walk, but [she] continued to have some tremors on and off." (Tr. 264; see Tr. 265-66). She was discharged to outpatient follow up care with Dr. Lamba. (Tr. 264). Upon discharge, plaintiff was assigned a GAF of 45. (Tr. 263).

Plaintiff returned for a second admission at Hall-Brooke Behavioral Health Services on February 8, 2007 as a result of a suicide attempt; she was treated by Dr. Isabel Gill. (Tr. 260-62, 270-72). She reported an inability to read or write, memory loss, a feeling of desperation, suicidal ideation, and the inability to tell time. (Tr. 260, 270). Plaintiff could not recall the names of her therapist or her medications. (Id.). She was treated with Effexor, Zyprexa, Clonazepam, Remeron, Asacol, and Thorazine. (Tr. 261, 262). Upon discharge she was prescribed Zyprexa, Effexor, Clonazepam, Remeron, Asacol, and Thorazine. (Tr. 261-62, 271-72). Plaintiff was diagnosed with Major Depressive Disorder, recurrent, severe with psychotic features, and cognitive disorder not otherwise specified. (Id.). Her GAF score upon intake was 20, and upon discharge on February 26, 2007, it was 25. (Tr. 260, 270). She was discharged to St. Vincent's outpatient care. (Tr. 261, 271).

Plaintiff was admitted to St. Vincent's Medical Center on February 26, 2007 for "further psychiatric stabilization"; she remained hospitalized until April 5, 2007. (Tr. 278-79,

Tr. 280-86).[13]   She was diagnosed with Major Depressive Disorder with psychotic

features and conversion disorder, and a dependent personality.  (Tr. 278).  Plaintiff was

assigned a GAF score of 50.  (Id.).  Over the course of her hospitalization, plaintiff's activities

of daily living "improved dramatically[,]" and upon discharge, she showed "[r]emarkable

improvement"; she was not depressed, not psychotic, and was not exhibiting any conversion

symptoms.  (Tr. 279).

On April 20, 2007, plaintiff went to St. Vincent's Medical Center Emergency Room

with a self-inflicted wrist laceration.  (Tr. 309-10).  She was diagnosed with depression, and

conversion disorder.  (Tr. 311).   On May 13, 2007, plaintiff sought medical attention for her

foot and wrist at the Norwalk Hospital emergency room.  (Tr. 428-29). She had lacerations

on her wrist and a "[q]uestionable distal radial intra-articular fracture." (Tr. 429).

Plaintiff was admitted to St. Vincent's Medical Center again on June 3, 2007, where she was

treated by Dr. Affany until her discharge seventeen days later.  (Tr. 294-95, 345-46; see Tr.

287-304, 326-34, 347, 359).[14]  She was admitted after plaintiff got "floridly psychotic and

manic over the weekend."  (Tr. 294, 345).  Plaintiff presented with "bizarre behavior,

---

[13]Plaintiff underwent an EKG on March 6, 2007, which revealed sinus tachycardia with an otherwise normal ECG.  (Tr. 276, 363; see Tr. 278).  On the same day, plaintiff was given a chest x-ray which found no enlargement of the heart, clear lungs, and no evidence of pulmonary disease or pleural effusion.  (Tr. 277, 364).  Plaintiff also received an x-ray scan of her abdomen on March 30, 2007 which revealed "gas and fecal residue in the colon" and "[m]inimal gas . . . in the small bowel" but "no evidence of free intraperitoneal air." (Tr. 275, 362).

Plaintiff underwent blood work on May 4, 2007.  (Tr. 325).

[14]Also on June 3, 2007, plaintiff underwent a urinalysis.  (Tr. 291-93).  It was negative for amphetamines, barbiturates, benzodiazepine, cannaboids, cocaine, opiates, and phencyclidine.  (Id.).  On the same day the plaintiff received an EKG test which showed "[n]ormal sinus rhythm" and "[n]ormal ECG."  (Tr. 289-90, 361).  On June 5, 2007, plaintiff was again given a chest x-ray and there was no change from the exam on March 6, 2007.  (Tr. 287, 295).   On the same day, an x-ray of plaintiff's forearm revealed an "undisplaced fracture involving the distal radius" and "periarticular demineralization at the metacarpal phalangeal joints." (Tr. 288, 360).

hypersexuality, and increased paranoia" as well as being "aviated . . . disinhibited, hypertalkative, and moderately agitated[,]" and having hypertension and a fractured right wrist. (Tr. 294, 303, 326, 345). She was diagnosed with "Bipolar disorder, most recent episode manic[,]" and dependent personality.[15] (Tr. 294, 333, 345). Plaintiff was treated with six additional treatments of right unilateral electro-convulsive therapy ["ECT"], Trazadone, Ativan, and Haldol. (Tr. 294, 300, 303, 334, 345, 359). Upon discharge, plaintiff was given a GAF rating of 55, and she was to receive ECT maintenance every two weeks. (Tr. 294-95, 345-46).

Two days prior to discharge, Dr. Affany completed a Medical Report of plaintiff, in which she noted that plaintiff has bipolar disorder and has been "suffering from severe depression with anhedonia[,] poor concentration, increased anxiety, delusional thinking, paranoia, suicidal ideations and suicide attempt" while in a severe manic episode. (Tr. 337; see Tr. 337-44). According to Dr. Affany this was a "pre-existing condition" for "many years" (Tr. 337), and plaintiff exhibited three severe episodes in the past six months. (Tr. 340). Dr. Affany noted that plaintiff was not significantly limited in her ability to understand, remember, and carry out short and simple instructions, but she was moderately limited in her ability to remember locations, carry out detailed instructions, perform activities within a schedule, sustain an ordinary routine, make simple work-related decisions, interact appropriately with the general public, ask questions or request assistance, accept instructions, maintain socially appropriate behavior, be aware of normal hazards, and set realistic goals. (Tr. 341-42). Additionally, Dr. Affany noted that plaintiff was markedly limited in her ability to understand and remember detailed instructions, maintain

---

[15]Upon admission, it was noted that plaintiff was "more psychotic than suicidal." (Tr. 332).

concentration and attention for extended periods, work in coordination with or proximity to others, complete a normal workday without interruptions from psychologically based symptoms, get along with co-workers or peers, respond appropriately to changes in the work setting, or travel in unfamiliar places or use public transportation.  (Id.).

On July 4, 2007, plaintiff was seen at St. Vincent's Medical Center (Tr. 348-53), where she was diagnosed with myalgias, treated with Toradol and told to return if her symptoms worsened or she developed a fever.  (Tr. 349, 351).  Two days later, on July 6, 2007, plaintiff was admitted to St. Vincent's Medical Center for seven days.  (Tr. 354-58).   She presented with suicidal ideation, delusions, and disassociation.  (Tr. 354).  She was diagnosed with "Bipolar disorder, depressed[,]" and dependent personality disorder and she was treated with Clozaril, Seroquel, and Ativan.  (Id.).   Plaintiff was assigned a GAF score of 50, and upon discharge, plaintiff's mood was "[m]uch  improved[,]" and she was "less depressed, more sociable, and not delusional."   (Tr. 354-55).

On July 17, 2007, Dr. Lamba completed a Mental Impairment Questionnaire for CT Disability Determination Services.  (Tr. 365-69).   Dr. Lamba reported treating plaintiff on a weekly basis from December 2006 until July 2007, and she also noted that plaintiff had received inpatient treatment at St. Vincent's Hospital and Hall-Brooke Behavioral, as well outpatient treatment for twelve years.  (Tr. 366).   Plaintiff was diagnosed with Bipolar Disorder, Most Recent Episode Manic, DSM-IV 296.44.  (Id.).   Dr. Lamba reported that plaintiff's appearance was disheveled and agitated, her memory, attention and concentration were impaired, her judgment was fair, and her insight was poor.  (Tr. 366-67).   According to Dr. Lamba, plaintiff had an "[o]bvious [p]roblem" in  "[u]sing good judgment regarding safety and dangerous conditions[,]" and she had a "[s]erious [p]roblem" taking care of her personal hygiene, caring for her physical needs, using appropriate coping skills, and handling

16

frustration appropriately.  (Tr. 367).  Additionally, Dr. Lamba opined that plaintiff also had a "[s]erious [p]roblem" requesting assistance, getting along with others, carrying out multi-step instructions, focusing, changing tasks, and performing basic work activities at a reasonable pace or on a sustained basis.  (Tr. 368).  Plaintiff was rated as having an "[o]bvious [p]roblem" interacting appropriately with others in a work environment, and carrying out single-step instructions, and she had a slight problem "[r]especting/responding appropriately to others in authority."  (Id.).

On August 27, 2007, plaintiff was seen for a right ankle injury at the Norwalk Hospital emergency room; there was "no evidence of a fracture, dislocation or other significant abnormality[,]" although a "small bone spur" was identified on plaintiff's large toe. (Tr. 430-32).

On September 17, 2007, Lindsay Harvey, PhD completed a Psychiatric Review Technique for SSA, in which Dr. Harvey concluded that while plaintiff appeared under an impairment at the time the form was completed, there was insufficient evidence of impairment in the time period at issue.  (Tr. 391; see Tr. 379-92).

On December 4, 2007, Dr. Levine prepared a letter regarding plaintiff's disability, in which he concluded that plaintiff has had "marked limitations in all areas of carrying out daily routines, particularly in areas of attention, concentration, focus, completing tasks, and memory[,]" and it was his opinion that plaintiff "was not able to work while she was under [his] care[,]" which was from May 1997 through December 2006.  (Tr. 393).

On December 16, 2007, plaintiff sought treatment for pain after falling and injuring her ribs.  (Tr. 433-34).  While there remained a deformity due to old trauma, there was no "acute fracture."  (Tr. 433).

As of February 7, 2008, it was Dr. Lamba's opinion that plaintiff "function[ed] at a

very low level" and "need[ed] help in basic living skills." (Tr. 445). On June 20, 2008, Dr. S. Hadi completed a Case Analysis of plaintiff for SSA, in which he noted that "[t]here is some data in 1998 to indicate treatment with Serzone, Lithium and Risperidone with no further detailed history or [mental status examination] by [Dr. Levine] . . . ." (Tr. 446). Dr. Hadi noted that "without documented [medical evidence of record] prior to [plaintiff's date last insured]," he was "unable to provide a medical opinion . . . ." (Id.).

As of November 17, 2009, Dr. Lamba reported that plaintiff had only "minimal improvements at times[,]" and that she required "a full time companion" to help address adult living skills. (Tr. 450). On November 30, 2009, Dr. Levine completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)" for SSA in which opined that plaintiff's limitations have existed "prior [to] 9/30/98[.]" (Tr. 447-49). According to Dr. Levine, plaintiff had extreme limitations in her ability to understand, remember, and carry out simple and complex instructions, make judgments on simple or complex work-related decisions, interact appropriately with the public, supervisors or co-workers, and respond appropriately to usual work situations and changes in a routine work setting. (Tr. 447-48). Dr. Levine described plaintiff as "[o]verwhelmed by anxiety[,]" "extremely fearful of other people [and] situations," and she had "regressed to a childlike state [and was] barely able to pick her head up." (Tr. 448). According to Dr. Levine, plaintiff's panic attacks were "so severe [and] have been for many years"; "she has been totally incapacitated [and] disabled for years -- definitely prior to Sept[ember] 30, 1998." (Id).

## C. HEARING BEFORE ALJ HORTON

Plaintiff, her husband, and a medical expert testified at a hearing before ALJ Horton on December 2, 2009. (Tr. 19-70). At the outset of the hearing, plaintiff's counsel stated that plaintiff's anxiety "prevent[ed] her from . . . testifying[,]" and she does not have any

recollection prior to September 30, 1998. (Tr. 22-23). However, upon request from the ALJ, the plaintiff testified briefly; she was able to recall her address and place of birth and correctly responded to questions about her age, date of birth, and marriage. (Tr. 26-27). Plaintiff reported an inability to drive and the need for a caretaker to help with cooking, cleaning, bathing, and dressing. (Tr. 27-29).

Her husband, Robert Mitchell, testified that plaintiff underwent "two changes[,]" one "about 1990 or [1991,]" and the second in the summer of 2006 (Tr. 30-31), but during the period in between, she was able to drive and she could understand things but she was afraid to apply for a job. (Tr. 31). When asked by ALJ Horton if he believed his wife could perform a "simple unskilled, sit down type of job" in 1998, he responded, "I suspect not because she used to get nervous . . . ." (Tr. 38). He testified that in 1995, he was out of work briefly and when he returned to work, plaintiff "was able to care for herself during that period of time[,]" although "[s]he [was not] able to work . . . ." (Tr. 36). He also testified that between 1998 and 2006, plaintiff had panic attacks and rage attacks, and she was "extremely depressed." (Tr. 33). Plaintiff's rage attacks occurred with some frequency, sometimes monthly, sometimes "a couple times a week." (Tr. 35). Plaintiff's husband testified that plaintiff "started being treated by Dr. Levine . . . [a]nd her condition improved to the point where in 2005[,] she . . . worked part-time . . . [o]n and off for four months." (Tr. 33). Additionally, he noted that "between 2000 to 2005[,]" his wife had been in five automobile accidents, and since 2006, she has been repeatedly hospitalized. (Tr. 30-31). He also reported severe emotional and psychiatric problems including psychotic episodes and severe anxiety. (Tr. 32, 35).

A clinical psychologist, Dr. Billings Fuess,[16] also testified at the Social Security hearing as a medical expert. (Tr. 44-64). Dr. Fuess opined that the evidence in the record showed that plaintiff met Listing § 12.04C as of the date of the hearing, and as far back as December 2006, based on the diagnoses of an chronic affective disorder, "bipolar [disorder] otherwise diagnosed as major depressive [disorder]," the accompanying medical records, and plaintiff's repeated hospitalizations. (Tr. 47-48). In reaching his conclusion, Dr. Fuess did not disagree with the diagnoses of Dr. Levine. (Tr. 56). However, he noted that plaintiff's record for the relevant time period, which consisted of Dr. Levine's progress notes, were "very, very brief[,]" and that made it "very difficult" to determine the severity of her symptom in that period. (Tr. 48-49; <u>see</u> Tr. 56). He added that while plaintiff was treated for anxiety, it is was not clear if the level of anxiety was disabling. (Tr. 49). He observed that Dr. Levine's progress notes included a May 8, 1998 entry in which Dr. Levine stated that plaintiff was "doing well" with the medication (Tr. 50), and when questioned about the medications plaintiff was taking during the relevant period (Tr. 49-50, 53-55, 60-63), Dr. Fuess noted that it was unclear if the medications were indicative of plaintiff's condition as some medications can treat multiple conditions. (Tr. 50, 53-55). Additionally, while Dr. Fuess noted plaintiff's record of low GAF scores, he also noted that the first score in the record was in December 2006. (Tr. 57-58).

## III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal

---

[16]The transcript erroneously refers to Dr. Fuess as Phil Foose. (Tr. 19, 21, 22, 20, 24, 44-45, 53, 64; <u>see also</u> Tr. 117-23). Dr. Fuess testified by telephone rather than in person (Tr. 45), to which plaintiff's counsel objected. (Tr. 24).

principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. See 42 U.S.C. § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working.

See 20 C.F.R. § 404.1520(a).  If the claimant is currently employed, the claim is denied.  See 20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. § 404.1520(c).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(e).  If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using guidelines ["the Grid"].  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her

physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

## IV.  DISCUSSION

ALJ Horton found that plaintiff has not engaged in any substantial gainful activity since September 1, 1998, the alleged onset date, through her date last insured of September 30, 1998.  (Tr. 9).  ALJ Horton then concluded that while plaintiff has had "significant deterioration in her mental condition since 2007" (Tr. 13), plaintiff did not have an impairment or combination of impairments that significantly limited plaintiff's ability to perform basic work-related activities for twelve consecutive months; therefore, plaintiff did not have a severe impairment or combination of impairments. (Tr. 9-13; see 20 C.F.R. § 404.1521 et seq.).  Accordingly, the ALJ concluded that plaintiff was not under a disability at any time from September 1, 1998 through her date last insured, September 30, 1998. (Tr. 13; 20 C.F.R. § 404.1520(c)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that plaintiff has severe mental illness, and consequently, the ALJ should have evaluated

plaintiff's Major Depressive Disorder, Generalized Anxiety Disorder, and Panic Disorder (Dkt. #11, Brief, at 13-15); the ALJ committed numerous factual errors in her evaluation of the evidence (id. at 15-20); plaintiff's Major Depressive Disorder meets Listing § 12.04 (id. at 20-22); the ALJ failed to makes findings as to plaintiff's degree of limitation in each of the functional areas pursuant to 20 C.F.R. § 404.1520a (id. at 22); the treating physician rule requires a finding of disability (id. at 22-27); the ALJ did not properly determine the credibility of plaintiff's corroborating witness (id. at 27-28); and the ALJ should have obtained the file on plaintiff's 1999 DIB application (id. at 28-31).

In response, defendant asserts that substantial evidence supports the ALJ's finding that plaintiff had no severe impairment or combination of impairments through her date last insured (Dkt. #16, Brief, at 9-12); plaintiff's allegations of factual errors do not require remand (id. at 12-17); plaintiff's impairments did not meet a Listing prior to her date last insured (id. at 17-18); the ALJ did not commit reversible error by failing to follow the special technique for evaluating mental impairments outlined in 20 C.F.R. § 404.1520a (id. at 19-20); the ALJ did not violate the treating physician rule (id. at 20-26); the ALJ properly considered the credibility of plaintiff's corroborating witness (id. at 26-29); and the ALJ did not commit legal error by failing to obtain plaintiff's prior disability application (id. at 29-30).

As discussed above, plaintiff's date last insured is September 30, 1998, and plaintiff filed her application for disability benefits claiming disability since September 1, 1998.[17] Thus, the relevant medical evidence to support the ALJ's decision are records prior to plaintiff's date last insured, and the relevant opinion evidence substantiating plaintiff's medical condition as of or prior to September 30, 1998. There is a discrete thirty day period

_____

[17]See note 1 supra.

in which plaintiff would have to satisfy her burden of establishing the existence of a disabling impairment.

At step two of the sequential analysis, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for twelve consecutive months, and thus plaintiff did not have a "severe" impairment.  (Tr. 13).   In the absence of a finding of a severe impairment at step two, the ALJ then concluded that plaintiff was not under "disability" as defined by the Social Security Act, at any time from September 1, 1998, plaintiff's alleged onset date, through September 30, 1998.  (Id.).

While plaintiff's record is replete with medical records substantiating the existence of what Dr. Fuess acknowledged was a severe mental impairment in 2006 that meets the Listing § 12.04C, the record of plaintiff's treatment in 1998 is sparse, and it must be considered in stark contrast to the extensive records commencing in 2006 which reflect several hospitalizations for symptoms of severe mental illness.  Further, while there is no dispute that plaintiff's mental impairment was severe as of December 2006, the treatment records do not reflect substantial impairment in 1998.  Rather, Dr. Levine's early treatment records reflect that from May to September 1998, plaintiff was seen for only three office visits.  (Tr. 377-78).   On May 8, 1998, plaintiff was prescribed Lithobid and Serzone and she was "doing well."  (Id.).   Additionally, Dr. Levine noted that plaintiff's "[i]rritability and volatility [were] gone." (Tr. 378).  On June 22, 1998, plaintiff was seen at Dr. Levine's office because she was "not doing as well on 600mg [of Lithium] as on 500 mg.  Had an outburst." (Tr. 377).  Dr. Levine changed plaintiff's medication.  (Id.).   On September 1, 1998, plaintiff was seen by Dr. Levine with her husband, at which time she was "[u]nable to tolerate [N]eurontin."  (Id.).   Dr. Levine changed plaintiff's medication to 900 mg of Lithobid, and

25

he had "her try Risperdal" on a trial basis, along with continuing Serzone. (Id.). On September 14 and 23, 1998, the entries reflect medication doses, and the entries for the next year, 1999, which include telephone calls from plaintiff, all reflect medication management. (Tr. 376-77). While plaintiff is correct that Dr. Levine recorded one-hundred-thirty-meetings with plaintiff and his office either for office visits or by telephone, the entries spanning the relevant time frame consist of just nine entries as referenced above.[18]

In his November 30, 2009 Medical Source Statement, upon which plaintiff relies, Dr. Levine rated plaintiff as having "extreme" restrictions in her ability to understand, remember, and carry out simple or complex instructions, to make judgments on simple or complex work-related decisions, and to interact appropriately with supervision, co-workers, and the public. (Tr. 447-48). According to Dr. Levine, plaintiff has had panic attacks which have left her "totally incapacitated and disabled for years -- definitely prior to Sept[ember] 30, 1998." (Tr. 448). Dr. Levine's contemporaneous treatments notes, however, do not support this conclusion.

Additionally, the ALJ appropriately sought the assistance of a medical expert to evaluate plaintiff's records and determine the nature and severity of plaintiff's impairments during the relevant time period, 20 C.F.R. § 404.1527(f)(2)(iii), who, upon review of the record and after hearing plaintiff's and her husband's testimony, concluded that plaintiff has met the Listing § 12.04C since December 2006, but that plaintiff's condition in 1998 was not "very well documented." (Tr. 48). Dr. Fuess testified that in his opinion, Dr. Levine's Medical Source Statement in which he "indicates extreme limitations in . . . almost every

_____

[18]The ALJ also appropriately noted in her decision that the "record was left open for a considerable period of time to afford counsel time to submit additional evidence from the earlier time period." (Tr. 13). However, as of the date of the decision, "no such additional records ha[d] been received." (Id.).

category," is just not supported by the record.[19]    (Tr. 50-52).

Pursuant to the Social Security Regulations, an impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings."  20 C.F.R. § 404.1508; see 20 C.F.R. §  404.1520(a)(4)(ii).  The few entries by Dr. Levine during the relevant time period fail to establish that plaintiff was under a severe impairment, and thus, the ALJ's conclusion is supported by the record, or the absence thereof.  See Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983)("The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say.")(citations omitted).  While counsel posits a suggestive correlation between the medications plaintiff was taking, as reflected in Dr. Levine's records from 1998, with medical diagnoses not made at that time, and the impact these suggested conditions would have on plaintiff's ability to work, there is simply a lack of medical evidence to substantiate a conclusion that because plaintiff was taking medications prescribed by Dr. Levine, she was disabled from September 1 through 30, 1998.  Further, the ALJ did not err in failing to rely on plaintiff's treating physician's opinions relating to the relevant time period as the opinions are not supported by contemporaneous medical records, and the opinions were offered in 2007 and 2009, nine and eleven years after the time period at issue.  (Tr. 365-69, 447-49).  See Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted); see 20 C.F.R. § 404.1527 (d)(2)(when the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence,

---

[19]While plaintiff's counsel at her hearing also questioned Dr. Fuess about plaintiff's GAF scores of 50 or below, which would be evidence of someone "unable to sustain work" (Tr. 57-58), Dr. Fuess observed that the first GAF score in the record was in December 2006.  (Tr. 58).

. . . [the ALJ] will give it controlling weight.").[20]

Moreover, in addition to the ALJ's proper and permissible consideration of the medical expert's opinion,[21] the ALJ properly relied on the opinion of the non-examining psychiatrist, Dr. Hadi, who noted that while "[t]here is some data in 1998 to indicate treatment with Serzone, Lithium and Risperidone [there is ] no further detailed history or [mental status examination] by [Dr. Levine] . . ." (Tr. 446). Dr. Hadi noted that "without documented [medical evidence of record] prior to [plaintiff's date last insured]," he was "unable to provide a medical opinion . . . ." (Id.). Similarly, on September 17, 2007, Dr. Harvey concluded that while plaintiff appeared under an impairment at the time the form was completed, there was insufficient evidence of impairment in the time period at issue. (Tr. 391; see Tr. 379-92).[22]

In addition to the foregoing, the ALJ properly considered the testimony of plaintiff's husband (Tr. 11), and the medical records of Dr. Levine, however limited, are consistent with plaintiff's husband's testimony that after treatment with Dr. Levine, plaintiff's condition improved for a period of time, and during this relevant time period, while he was working,

[20]Additionally, the ALJ was not required to recontact Dr. Levine as there was not a "conflict or ambiguity that must be resolved," and the medical evidence received was not "inadequate for [the ALJ] to determine whether [plaintiff was] disabled" as of September 30, 1998. 20 C.F.R. § 404.1512(e)(1). Dr. Levine's treatment records showed that plaintiff was generally doing well with medication during the relevant time period and in the few years that followed. (Tr. 375-78).

[21]As defendant acknowledges, the ALJ erred when she stated that she was giving the medical expert "controlling weight"; however, the Court agrees that the ALJ's decision reflects that she considered the other evidence of the record to support her ultimate decision. (Tr. 11-13; see Dkt. #16, Brief, at 24, n.6).

[22]"State agency medical and psychological consultants . . . are highly qualified psychologists who are experts in Social Security disability evaluation," 20 C.F.R. § 404.1527(f), and, as the Second Circuit has held, the opinions of non-examining sources can override the treating sources' opinions provided they are supported by evidence in the record. Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

plaintiff was able to care for herself, cook simple things, get dressed and clean up. (Tr. 33, 36). Moreover, even after crediting plaintiff's husband's testimony, the medical expert opined that the severity of plaintiff's impairment as of September 1998 was not well documented and the contemporaneous records do not support the Dr. Levine's 2009 assessment of the severity of plaintiff's impairment.[23] (Tr. 50-52). While the ALJ did not specifically state how she treated plaintiff's husband's testimony, her consideration of the testimony, followed by an assessment of the medical opinions and medical evidence of the record, suffices to support her finding that plaintiff did not have a severe impairment during the relevant time period. See Francis v. Astrue, No. 3:09 CV 1826 (VLB)(TPS), 2010 WL 3432839, at *4 (D. Conn. Aug. 30, 2010), adopted over objection, 2011 WL 344087 (D. Conn. Feb. 1, 2011).

## V. CONCLUSION

For the reasons stated above, plaintiff's Motion for Order to Reverse the Decision of the Commissioner (Dkt. #11) is denied, and defendant's Motion to Affirm the Decision of the

---

[23]Finally, plaintiff contends that the ALJ committed legal error by failing to obtain plaintiff's prior disability application. (Dkt. #11, Brief, at 28-29). The Hearing, Appeals and Litigation Law Manual ["HALLEX Manual"] for SSA "provides that an ALJ is not required to obtain a claimant's prior claim file when, as here, '[a]t least four years have elapsed between the date of the prior notice of initial determination and the date of the new application.'" Rocchio v. Astrue, No. 08 Civ. 3796(JSR)(FM), 2010 WL 5563842, at *13 (W.D.N.Y. Nov. 19, 2010), citing Soc. Sec. Admin. Office of Hr'gs and Appeals, HALLEX: Hearings, Appeals and Lit. Law Manual, I-2-1-10(D)(3) (September 2005), adopted absent objection, 2011 WL 119752 (S.D.N.Y. Mar. 20, 2011). Plaintiff's prior application was filed on August 15, 1999 (see Dkt. #11, Brief at 28), and her current application was filed on June 20, 2007. Accordingly, the SSA's internal guidelines did not mandate retrieval of the file. See Rocchio, 2010 WL 5563842, at *13. Additionally, there is no evidence that plaintiff's counsel requested that the prior file be obtained, even after the ALJ left the record open for further supplementation (Tr. 13), and, as in Rocchio, the prior claim was denied, thus it is "sheer speculation" that the medical information in the prior application would assist plaintiff's current disability claim.

As for plaintiff's remaining assertions, plaintiff's disability status as of 2006 or now is just not at issue in this case. As stated repeatedly above, the ALJ's finding that plaintiff was not disabled as of September 1998 is supported by substantial evidence of the record. Accordingly, the Court declines to address plaintiff's remaining arguments.

Commissioner (Dkt. #16) is <u>granted</u>.

The parties are free to seek the district judge's review of this recommended ruling.

<u>See</u> 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; Fᴇᴅ. R. Cɪᴠ. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 24th day of May, 2011.


    /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge